Center for Specialty Care, Inc. v CSC Acquisition I, LLC (2020 NY Slip Op 03631)





Center for Specialty Care, Inc. v CSC Acquisition I, LLC


2020 NY Slip Op 03631


Decided on June 25, 2020


Appellate Division, First Department


Mazzarelli, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 25, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Angela M. Mazzarelli
Ellen Gesmer
Cynthia S. Kern, JJ.


653849/16 

[*1]Center for Specialty Care, Inc., et al., Plaintiffs-Respondents,
v
CSC Acquisition I, LLC, et al., Defendants-Appellants.



Defendants appeal from the judgment of the Supreme Court, New York County (Charles E. Ramos, J.), entered January 16, 2018, to the extent appealed from, in plaintiffs' favor on liability as to breach of an asset purchase agreement, an administrative services agreement, a lease agreement, and a personal guarantee. Defendants also appeal from the order of the same court and Justice, entered January 8, 2018, which granted plaintiffs' motion for summary judgment and denied defendants' motion for summary judgment.




Kasowitz Benson Torres LLP, New York (Marc E. Kasowitz, Daniel R. Benson, Sarmad M. Khojasteh and Henry B. Brownstein of counsel), for appellants.
Manatt, Phelps & Phillips, LLP, New York (Ronald G. Blum, Prana A. Topper and Andrew Case of counsel), for respondents.



MAZZARELLI, J.,


Plaintiff Center for Specialty Care, Inc. (CSC) operated an ambulatory surgical center located at 50 East 69th Street in Manhattan. CSC, a family business, was a leasehold tenant of plaintiff 50 East 69th Street Corporation (50 East), also controlled by the family, which owned [*2]the building that housed the surgical center. CSC held a Certificate of Need (CON)[FN1] from the Department of Health in accordance with Public Health Law article 28. In 2013, the family that owned CSC and 50 East decided to sell the business, and lease the building to a buyer that would operate the medical facility. They began to solicit bids in 2014.
A bid to purchase CSC was made by defendant Glen Klee Lau, M.D., and accepted by CSC. Lau is a surgeon who, since 1998, has acquired an ownership interest in around 20 surgical centers that he manages in California, Las Vegas, New York, and New Jersey. Lau's bid proposed a purchase price of $5 million and monthly lease payments of $100,000. The parties agreed to structure the transaction around four separate agreements: (1) an asset purchase agreement (APA); (2) a lease of the building; (3) an administrative service agreement (ASA); and (4) a personal guarantee of the Lease running from the individual defendants, doctors who joined Lau's venture, to CSC.
The overarching agreement was the APA, dated August 4, 2015, which was between CSC on the one hand, and defendants CSC Acquisition I, LLC and Midtown Fifth Avenue Management, LLC, entities set up by Lau, and Lau individually, on the other hand. The contract price for the sale required payment of a $500,000 deposit into an escrow account upon execution of the APA, with closing of the APA to take place on or before June 1, 2016. The APA contained standard integration and no waiver clauses. The parties also agreed to "take . . . all such action as may reasonably be necessary or appropriate to achieve the purposes" of the APA.
Perhaps the most important action required of the parties would be to ensure that defendants could be issued their own CON, which would be necessary for them to operate the surgical center. To that end, CSC represented in the APA that it had "not been served with any notice by any governmental authority which . . . requires the performance of any work or alterations on the Facility" such that would possibly impede the issuance of a CON to defendants, except as set forth in Exhibit M. Exhibit M, in turn, acknowledged that a DOH survey on July 9, 2014 had found that CSC "was not in compliance with certain structural requirements," but that "[r]emediation works undertaken to address the cited defaults were approved following a subsequent DOH survey on . . . June 29, 2015, except for a life safety issue pertaining to remote means of egress." The representation further stated that CSC had worked with "a healthcare architect, a contractor and the DOH to address this remaining issue," and that CSC "currently contemplated that the DOH will waive this requirement in exchange for enhancement of existing safety measures through the installment of additional sprinklers, heat and smoke detectors," which were in the process of being designed.
For its part with respect to legalizing the arrangement, CSC Acquisition was obliged to:
"obtain all necessary approvals from the DOH . . . no later than June 1, 2016. Without limiting the foregoing, the Buyer shall file its [CON] application . . . no later than September 1, 2015. Seller shall fully cooperate with the Buyer in its CON application process including by providing any information needed to complete such application which is in the Seller's control. The Buyer shall [*3]provide a copy of its proposed CON application . . . as well as any and all other documents . . . to the Seller no later than ten (10) days prior to the date that the Buyer intends to submit same to the DOH . . . ."
Otherwise, Lau and his entities "jointly and severally" agreed that the APA "constitute[d] a legally valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms." Further, they represented that they had the financial wherewithal to perform under the APA and the Lease. They also represented that they "fully and completely investigated the Assets, the Contracts, the Permits, the Facility, the premises where the Facility is located, the books and records . . . and the operations of the Seller and the Facility," and that none of them had "relied on any representations, warranties or outside agreements, whether written or oral, of the Seller other than as expressly set forth within this Agreement." Finally, the APA recited, "Dr. Lau has the financial ability, knowledge and skill necessary to perform his obligations under the [ASA]."
The APA required CSC Acquisition to enter into the Lease, which the former provided would take effect on September 1, 2015 (this date was ultimately extended to October 1). The Lease required CSC Acquisition to provide a $6 million security deposit or a letter of credit in that amount. Lau elected, as permitted by the Lease, to make this payment through the combination of a $3 million letter of credit, a $3 million insurance policy on the life of Lau naming 50 East as the beneficiary, and a signed guaranty from the four individual defendants.
The APA also required CSC and Lau to enter into the ASA, under which Lau would act as the administrator of CSC and "have substantial control over the operations and financial performance" thereof. Under the ASA, CSC retained Lau to be the "sole and exclusive Administrator" of the ambulatory surgery facility beginning September 1, 2015 and continuing through termination of, or closing under, the APA. The ASA noted that "consummation of the APA is subject to" DOH approval of the CON, which the parties anticipated would "take at least several months." Lau agreed in the ASA to make "advances" to CSC to cover its operations, in the form of, inter alia, the rent due under the Lease. The ASA provided that Lau would not be able to recover these advances if the APA did not close before June 1, 2016 or was terminated for cause. Lau also warranted that the ASA "constitutes a legally valid and binding obligation . . . enforceable against [him] in accordance with its terms."
The parties agreed in the APA that time was of the essence with respect to the performance of their respective obligations.
The obligation of both sides to close was contingent upon receiving "[a]ll approvals required by applicable law to be obtained from any governmental or regulatory entity" before the closing date, "including, but not limited to, Buyer's receipt of a non-contingent, unconditional final approval" of the CON to operate the facility. The APA recognized that plaintiffs had considered multiple bids and that holding another bidding process if defendants defaulted was impracticable. Thus, the agreement provided that, if the closing did not take place, "the Seller shall suffer substantial losses and damages which shall be difficult to quantify," and that if the sale were not closed by June 1, 2016, defendants "shall pay to the Seller, as liquidated damages and not as a penalty, a sum equal to" the $500,000 APA deposit plus the $6 million security deposit under the Lease.
Even though the relevant documents were dated August 4, 2015, they did not become effective until September 10, 2015, when plaintiffs delivered them and declared them to be effective. When they delivered the executed documents, plaintiffs reminded Lau that occupancy under the Lease and operation under the ASA were conditioned on receiving the fully-executed guarantee and the security deposit represented by a $3 million letter of credit and evidence of the [*4]insurance policy on Lau's life in the same amount. Plaintiffs requested the documents "as soon as possible so that there can be a smooth transition on October 1st."
Lau ran into difficulty securing a potential letter of credit with a bank. According to defendant Chin's testimony at his deposition, bank representatives were concerned that Lau would have too little control over the surgical center and that there was no consideration for the Lease. Lau testified that the bank representative had said that the amount sought was "excessive for this kind of health care transaction." Because Lau could not procure the letter of credit, he was not able to satisfy the security deposit requirement of the APA. Further, he did not make the rental payment required on October 1, 2015, the effective date of the Lease, nor did he begin performance under the ASA. Lau also did not submit the CON application to DOH by September 1, 2015, as required by the APA.
On September 30, 2015, the day before the effective date of the Lease, Lau emailed plaintiffs' representatives to discuss the possibility of altering the Lease so it would go into effect after DOH approval of the CON. Defendants' counsel wrote separately to plaintiffs' counsel that they should have the new lease become operative after CON approval and upon closing on the APA. Lau testified that CSC Acquisition never paid rent to 50 East because they "never completed the transaction approved by the [DOH] [so] that I could lease the space." The parties conducted extensive negotiations seeking to amend the deal, but were unable to arrive at a satisfactory settlement.
By letter dated November 11, 2015, plaintiffs' counsel served defendants with a notice of default under the APA for violating the warranty concerning financial ability, failing to maintain financial solvency, and failing to take steps reasonably necessary to achieve the APA's purposes. By separate letter dated November 11, 2015, plaintiffs' counsel served a notice of default under the Lease, for failure to pay rent and the security deposit, failure to provide certificates of insurance, and failure to name 50 East as the beneficiary on Lau's life insurance policy. In a third letter dated November 11, 2015, plaintiffs' counsel served a notice of default under the ASA, for Lau's failure to make advances to cover operations and failure to commence his role as the facility administrator.
Defendants did not cure the defaults cited by plaintiffs. By letter dated December 29, 2015, defendants' counsel terminated the APA and ASA based on CSC's refusal under APA § 7(b) to cooperate fully with their CON application. Defendants proposed to reinstate the contracts with various changes to the ASA, increase the rent beginning March 2016 with Lau guaranteeing payments under the ASA, and provide an 18-month period to seek CON approval. Alternatively, defendants sought a return of their $500,000 deposit. Nevertheless, plaintiffs terminated the APA, the ASA, and the Lease, citing defendants' failure to remedy their breaches.
Plaintiffs commenced this action for money damages based on defendants' alleged breach of each of the relevant contracts. In their answer, defendants alleged that Lau signed the contracts with plaintiffs "[b]elieving the signatures were simply part of the [CON] application process," and that plaintiffs breached the APA by not providing financial documents to support the CON application. Defendants moved for summary judgment dismissing the complaint, arguing that there was no meeting of the minds for any of the contracts. They also asserted frustration of purpose, because the premises could not be occupied under the Lease without issuance to them of a CON. Additionally, they claimed that plaintiffs failed to satisfy conditions precedent, since plaintiffs did not provide financial records for defendants' CON application, nor did they remedy the life safety violations. Finally, they argued that plaintiffs were not entitled to liquidated damages, because recovery under that provision would be disproportionate to actual loss.
Plaintiffs also moved for summary judgment. They argued that defendants breached the Lease by failing to pay the security deposit and rent, and that the Lease was entered into after [*5]arm's-length negotiations between sophisticated, counseled businesspeople. Plaintiffs further argued that the guarantees were breached by the individual defendants' failure to ensure compliance with the Lease; that the APA was breached because defendants did not file the CON application by September 1, 2015; and that the ASA was breached because Lau never made advances to cover CSC's operating costs or managed the facility. The motion court denied defendants' motion and granted plaintiffs'.
Defendants argue on appeal that the contracts are not enforceable. First, they claim, the Lease was never intended to go into effect until the CON was transferred by DOH, and was only executed because DOH would not have processed the application without it. Indeed, they claim, it would have been impossible for defendants to operate as a surgical center without the CON. They further assert that, in any event, the entire arrangement was dependent on the issuance of the CON and that plaintiffs' own actions frustrated defendants' efforts to obtain the CON. Specifically, defendants argue, plaintiffs failed to disclose the nature of the various code violations imposed by DOH on the building, and abandoned attempts to obtain a waiver. Defendants further argue that plaintiffs prevented them from submitting the CON application before the September 1, 2015 deadline, because they did not even return executed documents to them until after that deadline had passed, and because, even after that date, they failed to share financial information that was necessary to support the application.
Plaintiffs argue that the contracts should all be enforced strictly according to their terms because they are clear and unambiguous, and were negotiated by sophisticated parties who were represented by counsel. They dismiss defendants' claim that performance under the Lease was impossible, pointing to the facts that the documents together anticipated that the CON would not be issued before the Lease became effective, and that the ASA was designed to permit the arrangement to go forward while the DOH application process progressed. As for the frustration argument, plaintiffs note that defendants did not request the financial information they contend was necessary for the application until two months after the Lease took effect. Finally, plaintiffs state that defendants' argument that the former did not seek a waiver of the life safety violations imposed by DOH despite representations to the contrary, is grounded in fraud, but that defendants did not plead fraud as an affirmative defense. In any event, plaintiffs argue, the record does not support defendants' position that plaintiffs abandoned attempts to address the violations.
Contracts "are construed in accord with the parties' intent," the "best evidence" of which "is what they say in their writing. Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Greenfield v Philles Records, 98 NY2d 562, 569 [2002] [internal quotation marks and citations omitted]). "The rule has even greater force in the context of real property transactions, where commercial certainty is a paramount concern,' and where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length" (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995], quoting W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). Here, the language of the Lease unambiguously provided that the term was to commence, and CSC Acquisition was to begin paying rent, on October 1, 2015. Further, this was an arm's-length transaction negotiated over months between the parties and their attorneys. There is no evidence that the parties executed the Lease for the purpose of attaching it to the CON application. The last-minute, but futile, scramble by Lau and Chin to secure the letter of credit required by the Lease supports this conclusion.
Similarly without merit is the notion that plaintiffs prevented defendants from performing under the Lease or the guarantees. "`[U]nder the doctrine of prevention, when a party to a contract causes the failure of the performance of the obligation due, it cannot in any way take advantage of that failure'" (Frank Brunckhorst Co., LLC v JPKJ Realty, LLC, 129 AD3d 1019, 1020 [2d Dept 2015], quoting 13 Richard A. Lord, Williston on Contracts § 39:3 [4th ed May [*6]2015]). In other words, "a party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (Kooleraire Serv. & Installation Corp. v Board of Educ. of City of N.Y., 28 NY2d 101, 106 [1971]; see Coby Elecs. Co., Ltd. v Toshiba Corp., 108 AD3d 419, 420 [1st Dept 2013]). Here, nothing in the record suggests that plaintiffs prevented defendants from paying rent or paying the security deposit due under the Lease. Plaintiffs' purported late delivery of the signed contracts on September 10, 2015 did not prevent performance beginning October 1. Also, plaintiffs' asserted failure to secure DOH violation waivers or cooperate with defendants' efforts to obtain the CON before June 1, 2016, under the APA, is not relevant to whether defendants were required to make the agreed-to payments under the Lease.
Nor do we accept defendants' argument that the purpose of the Lease was frustrated. "In order to invoke the doctrine of frustration of purpose, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense" (Warner v Kaplan, 71 AD3d 1, 6 [1st Dept 2009] [internal quotation marks omitted], lv denied 14 NY3d 706 [2010]]; see Jack Kelly Partners LLC v Zegelstein, 140 AD3d 79, 85 [1st Dept 2016], lv dismissed 28 NY3d 1103 [2016]). Examples of a lease's purposes being declared frustrated have included situations where the tenant was unable to use the premises as a restaurant until a public sewer was completed, which took nearly three years after the lease was executed (see Benderson Dev. Co. v Commenco Corp., 44 AD2d 889 [4th Dept 1974], affd 37 NY2d 728 [1975]), and where a tenant who entered into a lease of premises for office space could not occupy the premises because the certificate of occupancy allowed only residential use and the landlord refused to correct it (Jack Kelly Partners, 140 AD3d 79).
However, "frustration of purpose . . . is not available where the event which prevented performance was foreseeable and provision could have been made for its occurrence" (Warner, 71 AD3d at 6[internal quotation marks omitted]). Here, the parties accounted for the fact that the CON would not be available on October 1, 2015, the effective date of the Lease. The very purpose of the ASA, which was negotiated separately from the Lease but as part of the larger transaction, was to address the fact that defendants could not occupy the premises until they had the CON. Indeed, the working capital payments called for in the ASA included the payments required by the Lease, since the ASA permitted Lau to start deriving the benefits of the surgical center before his own entity could legally occupy it. Because the parties acknowledged, and planned for, the fact that CSC Acquisition would not be able to occupy the building on the effective date of the Lease, this case cannot be compared to cases such as Jack Kelly Partners, where the tenant was completely deprived of the benefit of its bargain. Indeed, the Lease itself cannot be divorced from the other agreements entered into by the parties, which universally addressed the anticipated delay in securing the CON.
The motion court was also justified in finding that defendants breached the APA. Plaintiffs are correct that this breach came about when defendants missed the deadline for filing the CON application, especially because time was declared in the agreement to be of the essence and the agreement contained a no-waiver clause. "Time is generally of the essence where a definite time of performance is specified in a contract, unless the circumstances indicate a contrary intent" (Burgess Steel Prods. Corp., 205 AD2d at 346 [1st Dept 1994]). Further, the deadline was a material term, since the entire transaction depended on issuance of the CON before the APA closing date. By first submitting their application three months after the September deadline, defendants were unquestionably in material breach of the APA (see Bisk v Cooper Sq. Realty, Inc., 115 AD3d 419, 419 [1st Dept 2014]).
There is no merit to defendants' position that plaintiffs prevented a timely filing through their own actions and inactions. It is true that plaintiffs did not provide the fully executed [*7]contracts until September 10, 2015. However, defendants utterly fail to explain their three-month delay in submitting the application after that date. Also, even though plaintiffs were obliged to provide their financial records under the APA, defendants' failure to file a timely CON application and to perform under the Lease were "prior material breach[es]" constituting "an uncured failure of performance that relieved [plaintiffs] from performing [their] remaining obligations under the contract" (U.W. Marx, Inc. v Koko Contr., Inc., 124 AD3d 1121, 1122 [3d Dept 2015], lv denied 25 NY3d 904 [2015]).
With respect to the DOH violations, defendants cannot deny that those were disclosed in Exhibit M to the APA. They argue instead that plaintiffs represented in Exhibit M that they were negotiating a waiver of the violations but in reality had abandoned that effort. This argument is not supported by the record. The consultants who were shepherding the application through DOH testified that they understood the issues needed to be resolved before the CON was issued, but that at some point the focus shifted to obtaining the CON. They never testified that they abandoned the process. To the contrary, one of the consultants testified that even in December 2015 it was "an ongoing dialogue between [DOH] and CSC." Furthermore, and critically, that consultant stated that the consultants would not have continued their work on the CON transfer application had they thought the life safety issues could not ultimately be resolved and that approval was not possible.
Finally, Lau breached the ASA because, for all the reasons outlined above, his failure to perform under it was not reasonably justified. Nor was the failure of the individuals to perform under the guarantees. Accordingly, summary judgment was also awarded to plaintiffs under those contracts. As to damages, the court correctly found that the liquidated damages clause of the APA is not a penalty, as it "`bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation'" (JMD Holding Corp. v Congress Fin. Corp., 4 NY3d 373, 380 [2005], quoting Truck Rent-A-Ctr. v Puritan Farms 2nd, 41 NY2d 420, 425 [1977]; see also Addressing Sys. & Prods., Inc. v Friedman, 59 AD3d 359, 360 [1st Dept 2009] [liquidated damages provision negotiated at arm's length is entitled to deference where parties to agreement are sophisticated businesspeople represented by experienced counsel]).
For all of the foregoing reasons, the court correctly granted summary judgment to plaintiffs.
Accordingly, the judgment of the Supreme Court, New York County (Charles E. Ramos, J.), entered January 16, 2018, to the extent appealed from, in plaintiffs' favor on liability as to breach of an asset purchase agreement, an administrative services agreement, a lease agreement, and a personal guarantee, should be affirmed, with costs. The appeal from the order of the same court and Justice, entered January 8, 2018, which granted plaintiffs' motion for summary judgment and denied defendants' motion for summary judgment, should be dismissed, without costs, as subsumed in the appeal from the judgment.
All concur.
Judgment, Supreme Court, New York County (Charles E. Ramos, J.), entered January 16, 2018, affirmed, with costs. The appeal from the order, same court and Justice, entered January 8, 2018,
dismissed, without costs, as subsumed in the appeal from the judgment.
Opinion by Mazzarelli, J. All concur.
Renwick, J.P., Mazzarelli, Gesmer, Kern, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 25, 2020
CLERK



Footnotes

Footnote 1: "The Certificate of Need (CON) program is a review process, mandated under state law, which governs the establishment, ownership, construction, renovation and change in service of specific types of health care facilities," including ambulatory surgical centers (www.health.ny.gov/facilities/CONS/more_information [last accessed May 6, 2020]).