Center for Specialty Care, Inc. v CSC Acquisition I, LLC (2020 NY Slip Op 04522)





Center for Specialty Care, Inc. v CSC Acquisition I, LLC


2020 NY Slip Op 04522


Decided on August 13, 2020


Appellate Division, First Department


Gische, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on August 13, 2020
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

David Friedman,J.P.
Dianne T. Renwick
Judith J. Gische
Angela M. Mazzarelli
Peter H. Moulton, JJ.


653849/16 652927/16 11802 

[*1]Center for Specialty Care, Inc., et al., Plaintiffs-Respondents,
v
CSC Acquisition I, LLC, et al., Defendants-Appellants.
Garfunkel Wild, P.C., as escrow agent, Plaintiff-Stakeholder,
v
Center for Specialty Care, Inc., et al., Defendants-Claimants.



Defendants appeal from the judgment of Supreme Court, New York
County (Andrew Borrok, J.), entered July 30, 2019, awarding plaintiff Center for Specialty Care, Inc. (CSC) the principal amounts of $6,500,000 for breach of the asset purchase agreement (APA), and $613,053.90 for breach of the administrative services agreement (ASA), and awarding plaintiff, 50 East 69th Street Corporation (50 East), $5,885,119.32 for breach of the lease and guaranty agreements.



Kasowitz Benson Torres LLP, New York (Sarmad M. Khojasteh, Marc E. Kasowitz, Daniel R. Benson and Henry B. Brownstein of counsel), for appellants.
Manatt, Phelps & Phillips, LLP, New York (Ronald G. Blum, Prana A. Topper and Andrew Case of counsel), for respondents.



GISCHE, J.


This breach of contract action arises from the failed sale of an ambulatory surgical center (ASC) owned by the Center for Specialty Care (CSC or seller) to defendant CSC Acquisition I (CSC Acquisition). Plaintiff 50 East 69th Street Corp (50 East), is an affiliate of CSC, and the owner of the townhouse where CSC operated its ASC, and where other doctors were subtenants. [*2]Both plaintiffs are owned by related family members and/or trusts. Following a bench trial on damages only, Supreme Court awarded plaintiffs the principal sum of $12,998,173.22 and judgment was entered thereon with interest. Defendants appeal from the judgment, contending that the award is grossly disproportionate to the contract price for CSC's assets, the liquidated damages are an impermissible penalty and, in any event, the damages were incorrectly determined.
Liability was the subject of a previous appeal. This Court recently affirmed Supreme Court's entry of judgment in plaintiffs' favor (Center for Specialty Care, Inc. v CSC Acquisition I, LLC, ___ AD3d ___, 2020 NY Slip Op 03631 [June 25, 2020]). In addition to finding that defendants had breached the parties' agreements, we also held that the liquidated damages clause was enforceable. This Court expressly recognized that plaintiffs had suffered substantial losses because the transaction did not close, the damages were proportionate to plaintiffs' "probable loss," and plaintiffs' actual damages were incapable or difficult to precisely estimate at the time of the contract. Although defendants, again, raise arguments that the liquidated damages are a penalty that should not be enforced, the issue of enforceability has been previously decided and will not be addressed in this decision. The issues remaining for consideration on this appeal are only whether the trial court properly determined the damages that resulted from defendants' breaches of contract.
In 2014, CSC decided to sell its ASC and other assets. The family members did not want to immediately sell the iconic townhouse at 69th Street, but they had fallen behind on mortgage payments and wanted to make sure they would not lose this valuable real property. To effectuate these goals, they began soliciting bids from buyers who would be willing to not only purchase the ASC, but would also agree to lease the building from 50 East. At or about this time CSC was paying rent to 50 East of approximately $110,720 a month. After extensive negotiations, in 2015, CSC reached an agreement with CSC Acquisition by which CSC Acquisition would acquire all of CSC's assets, including its medical equipment, furnishings, patient records, web site, as well as various contracts and agreements it had with other medical professionals who maintained offices at the townhouse. Defendant Midtown Fifth is the sole member of CSC Acquisition, a limited liability company, and defendant Glen Klee Lau, M.D., a surgeon, is the sole manager and member of Midtown (collectively buyer).
The transaction involved three interlocking agreements and a fourth agreement, a personal guaranty. The agreements: 1) secured a long-term tenant able to pay substantial rent and allowed 50 East to continue ownership of the building while meeting its mortgage and other financial commitments, 2) provided for the purchase of CSC's assets, and 3) set up an arrangement by which financially ailing CSC would be able to continue to operate pending closing of the CSC asset sale. The agreements, effective September 1, 2015, cross-reference and reinforce one another.
The dominant or overarching agreement is the asset purchase agreement (APA) between CSC and CSC Acquisition by which CSC Acquisition would acquire CSC's assets, including the practice. The contract price for the purchase was $5 million dollars and required a $500,000 down payment to be held in escrow pending closing. A material term of the APA required that CSC Acquisition obtain the transfer of CSC's existing permit to operate the premises as an ambulatory surgery center, known as a certificate of need (CON). Although the APA was effective as of September 1, 2015, it provided for a lengthy sale closing date of June 1, 2016. This closing date took into account that the necessary approval by the New York State Department of Health for transfer of the permit, as required under the Public Health Law, might take time to obtain. It was legally impossible for CSC Acquisition to operate the ASC without the permit.
In order to facilitate CSC's application for transfer of the CON to CSC Acquisition, CSC agreed to provide all the necessary information about the ASC. Among the information CSC provided was disclosure about certain health code violations that existed at the premises. For its part, CSC Acquisition agreed that it would "obtain all necessary approvals from the DOH . . . no [*3]later than June 1, 2016" and that it would file its [CON] application . . . no later than September 1, 2015. Obtaining all necessary governmental and regulatory approvals, including DOH's approval for transfer of the CON, was a condition for closing. Section 10 (b) of APA provides that the agreement would be terminated "in the event the Buyer fails to obtain all DOH and PHHP [NYS Public Health and Health Planning Council] approvals, without conditions, necessary for it to consummate the transactions contemplated under this Agreement, on or prior to June 1, 2016 (other than if such failure is solely on account of any act or omission of the Seller) . . . ."
Pursuant to the APA, the parties agreed that CSC was not selling, nor was CSC Acquisition acqiring, any interest in any of CSC's cash or cash equivalents existing as of September 1,
2015. It was also contemplated by the parties that from the effective date forward Dr. Lau would not be entitled to receive any earnings until all CSC's expenses were paid, and then only after the APA closing and the transfer of the CON to CSC
Acquisition had occurred. To effectuate this understanding, the parties agreed that although Dr. Lau would act as CSC's administrator, he would do so as an independent contractor until such time as CSC Acquisition obtained "a non-contingent, unconditional final approval" of the transaction from DOH. In the interim and until closing, CSC would continue to operate the ASC as its owner. This arrangement was memorialized in the administrative services agreement (ASA) between CSC and Dr. Lau.
Pursuant to the ASA, Dr. Lau agreed to provide CSC with wide-ranging, administrative services from September 1, 2015 until closing. Dr. Lau was not only responsible for making sure all of CSC's accounts payable were paid, he was also obligated to provide CSC with monetary advances on an unsecured basis. These monetary advances, referred to in the ASA as "Working Capital Loans" would be applied and used to pay whatever operating expenses CSC's own earnings did not meet. At closing, CSC would have to repay these loans with interest, but if the APA was terminated and did not close, then CSC would not be obligated to repay them. Sections 12(b) and (d) of the ASA state that at closing, any profits remaining after the payment of all accrued and unpaid expenses would be paid to Dr. Lau. Neither the APA nor the ASA assure Dr. Lau of any profits during the effective date of the ASA, nor does either agreement assure CSC that it will suffer no operating losses. Section 13(b) of the ASA states, however, "[s]hould a Closing of the APA not take place prior to June 1, 2016 or should the APA otherwise be terminated sooner in accordance with the terms of Section 10(b) or Section 10(d) thereof . . . then CSC shall not be required to repay any Working Capital Loan amounts or any interest thereon."
A third agreement concerning this transaction was a real property lease for the townhouse. The lease, between 50 East and CSC Acquisition, was effective as of September 1, 2015, concurrent with the parties' execution of the APA and ASA, but 50 East later agreed to defer the commencement date to October 1st. The monthly rent was set at $185,000, but the parties later also agreed to a reduced initial rent.
As reflected in Section 1.2 of the lease, it was for a 10-year term, unless extended or sooner terminated. The lease also provides that if the APA "shall terminate for any reason, this Lease shall terminate simultaneously therewith. . . ." Section 17.2 of the lease provides that in the event of the tenant's breach 50 East can relet the premises for the account of the tenant, and that the tenant is responsible for rent and additional rent until the end of the stated term of this Lease . . . . These lease provisions frame the parties' vigorous disagreement about whether and when the lease ended.
Section 21 of the lease obligated CSC Acquisition to deliver a $6 million security deposit to 50 East on October 1, 2015. Instead of making a cash deposit, CSC Acquisition could provide a $6 million irrevocable letter of credit; or a personal guaranty, plus a $3 million life insurance policy on the life of Dr. Lau, plus an irrevocable letter of credit for $3 million. CSC Acquisition chose the latter option and the four individually named defendants personally guaranteed the lease, including the payment of rent and security deposit.
The security deposit, although set out in the lease, is a cornerstone of CSC's sale to the buyers, as reflected in the following provision of the APA:
"9. Effects of Termination. (a) The Buyer [CSC Acquisition] recognizes and agrees that it has been selected by the Seller [CSC] as the purchaser of the Assets after a process which involved the examination by the Seller of multiple bids to purchase all or some of such Assets by other third parties which has entailed the incurrence by the Seller of significant costs and expenses. As a result of the selection of the Buyer, the Buyer further recognizes and agrees that the Seller is unlikely to be able to engage in another process whereby similar bids will be submitted by such or other third parties should the Closing not take place on or prior to June 1, 2016 and that, in such case, the Seller shall suffer substantial losses and damages which shall be difficult to quantify.
"(b) In light of the provisions of Section 9(a) hereof, the Buyer [CSC Acquisition], the Member [Midtown] and Dr. Lau jointly and severally agree that, should the Closing of this Agreement not take place prior to June 1, 2016 or should this Agreement be terminated sooner in accordance with the terms of Section 10(b) or Section 10(d) hereof, the Buyer, the Member and Dr. Lau shall pay to the Seller, as liquidated damages and not as a penalty, a sum equal to: (i) the Escrow Deposit [$500,000], plus (ii) an amount equal to the security deposit as required to be maintained under the Real Property Lease (the "Security Deposit")."
CSC Acquisition did not file for transfer of CSC's CON by September 1st, nor did it ever obtain the necessary DOH approval, as required under the APA, leaving CSC Acquisition unqualified to complete the purchase of CSC's assets and assume ownership and operation of the ASC. Dr. Lau also failed to assume any of his administrative duties under the ASA. He did not provide CSC with any monetary advances to help it meet its operating expenses. CSC Acquisition failed to deliver security for the lease in any form, and it did not pay the first month's rent or any rent thereafter. CSC Acquisition never took possession of the premises under the lease.
The parties tried, but failed, to work out their differences to salvage the transaction. Consequently, on November 11, 2015, plaintiffs sent default notices to the defendants. Defendants countered by filing an application with DOH for transfer of CSC's CON in early December 2015. Shortly thereafter, on December 29th, defendants purported to terminate the agreements, citing plaintiffs' refusal to help them obtain the CON. Defendants also made certain demands to reinstate the contracts on more favorable terms, including asking for more time (18 months), to obtain the CON from DOH. Further discussions between the parties also proved unfruitful. On January 6, 2016, plaintiffs notified defendants that the APA, ASA and lease were terminated, with a reservation of rights. CSC remained in operation at the premises, paying rent to 50 East and other expenses. Eventually, in March 2016, plaintiffs closed the ASC, lost the CON at or about that time, and sold the townhouse in November 2017.
Defendants argue that although the asset sale under the APA did not close, it was CSC [*4]that breached the APA by assuring CSC Acquisition that DOH would waive the safety code violations that CSC knew were life threatening and needed to be corrected before the DOH would approve transfer of the permit. They also generally argue, without citing to a particular lease provision, that the lease was contingent upon CSC Acquisition obtaining DOH's approval of the CON. Both issues, however, concern liability, which was resolved against defendants in the prior appeal.
Insofar as the actual calculation of damages, defendants argue that the liquidated damages clause is unenforceable. They also argue that Supreme Court erroneously awarded 50 East damages for a l5-month period after CSC Acquisition repudiated the lease. According to defendants, a surrender by operation of law occurred on December 15, 2015 when 50 East allowed its affiliate (CSC) to continue operations at the townhouse, and significantly reduced CSC's rent. CSC Acquisition contends CSC's actions effectively ended its landlord/tenant relationship and terminated its obligation to pay rent/additional rent due.
Alternative dates proposed by defendants for when the lease should be considered terminated, include: March 31, 2016, the month plaintiffs began marketing the premises for sale; May 12, 2016, when plaintiffs required that all surgeries cease at their ambulatory surgery center; (the sole permitted use under the lease with defendants); or July 31, 2016, the month plaintiffs fully evacuated the premises and surrendered its CON to DOH. The alternative dates are based upon CSC Acquisitions' same theory, which is that CSC's actions were inconsistent with the landlord-tenant relationship. Each of these proposed termination dates occurred before the sale of the townhouse in November 2017, the date utilized by the trial court in calculating damages. Finally, defendants argue that the trial court should not have awarded CSC damages in the form of lost profits under the ASA.
At the conclusion of the bench trial on damages, the trial court awarded the seller $6.5 million pursuant to the APA's liquidated damages clause. It awarded $5,885,119 to 50 East representing rent due from the inception of the lease (October 1, 2015), through October 31, 2017 (the day before the townhouse was sold), plus interest and penalties, less the rent that CSC paid during that time. With respect to the ASA, Supreme Court awarded damages against Dr. Lau in the amount of $613,054, plus interest. This amount represented CSC's operating losses from October 1, 2015 through January 6, 2016, the date plaintiffs terminated the parties' agreements.
Defendants' arguments concerning the liquidated damages awarded by Supreme Court pursuant to the terms of the APA are indistinguishable from those raised and already decided by this Court with respect to their appeal from the liability judgment. We sustained the contractual provision in the APA fixing damages in the event of breach (Center for Specialty Care, Inc. v CSC Acquisition I, LLC, ___ AD3d ___, 2020 NY Slip Op 03631 [2020]). The provision for liquidated damages is reasonably related to potential harm that was difficult to estimate when the parties made their contract and did not constitute a disguised penalty (Truck Rent-A-Ctr. v Puritan Farms 2nd, 41 NY2d 420, 427 [1977]). Since the $6.5 million judgment entered against defendants for breach of the APA is firmly supported by Section 9 of the APA, and defendants raise no argument that it was miscalculated by the trial court, we affirm that part of the trial court's award.
Turning to the damages award for breach of the lease and guaranty, defendants argue the trial court's damages award is incorrect, and that any new award should be limited to the amounts owed under the lease for the period of October 1, 2015 through December 10, 2015, that being when, according to defendants, the lease was surrendered by operation of law. A surrender by operation of law occurs when a landlord takes actions so inconsistent with the landlord-tenant relationship that a legal surrender can be inferred (see Riverside Research Inst. v KMGA, Inc., 68 NY2d 689, 691-692 [1986]). Although defendants have also proposed other dates when the lease was legally surrendered, we find none of plaintiffs' actions on any of those dates, including December 10th, were so inconsistent with the terms of this lease that they resulted in a legal surrender.
Since a lease is a present transfer of an estate in real property, "[o]nce the lease is executed, the lessee's obligation to pay rent is fixed according to its terms and a landlord is under no obligation or duty to the tenant to relet, or attempt to relet abandoned premises in order to minimize damages" (Holy Prop. v Kenneth Cole Prods, 87 NY2d 130, 133 [1995][citation omitted]). Here, as we already held in the prior appeal, CSC Acquisition breached the lease and the landlord, faced with such breach, had three options: "(1) it could do nothing and collect the full rent due under the lease . . . (2) it could accept [CSC Acquisition's] surrender, reenter the premises and relet them for its own account thereby releasing the tenant from further liability for rent, or (3) it could notify the tenant that it was entering and reletting the premises for the tenant's benefit" (Holy Prop., 87 NY2d at 133-134). The right to relet the premises for the tenant's benefit was an express term of the lease in this case.
When CSC Acquisition breached the lease, and 50 East relet the premises to CSC on December 15, 2015, the landlord's actions were wholly consistent with its rights under the law and the lease to relet the premises for the tenant's benefit; this was not a surrender by operation of law. Nor were CSC's other actions in continuing to operate the ASC inconsistent with the lease because the parties' agreements provided for CSC's ongoing operation of the ASC until closing, subject to Dr. Lau's administrative duties. The continued operation of the ASC before closing was a critical aspect of the transaction, because defendants could not lawfully operate the ASC themselves in the absence of the CON. 50 East's extension of CSC's lease and its acceptance of reduced rent was also consistent with the continued operation of CSC's business. These are not actions from which it can be inferred that a legal surrender of the lease occurred (see Riverside Research supra).
We do agree with defendants that their rent obligation only continued until such time as the lease was legally terminated. Supreme Court determined that occurred when the townhouse was sold. We find that that the lease terminated on January 6, 2016, when CSC sent termination notices to the defendants ending the lease and other agreements. 50 East notified defendants in November 2015 that it would be terminating the lease, and then proceeded to act in accordance with that notice by serving a notice of termination dated January 6, 2016. The lease, which was executed simultaneously with the APA, specifically provides (Section 1.2), that if the APA is terminated for any reason, other than closing, the lease will "terminate simultaneously" with the APA. The lease also expressly provides that CSC Acquisition remains responsible for rent and other applicable charges, less rent recovered from reletting, only "up to the time of such termination . . . or of such recovery of possession of the Premises by Landlord . . . ." Thus, when plaintiffs terminated the parties' agreements, the obligation to pay rent was terminated with it as well.
50 East had no duty to mitigate damages, but by continuing to accept rent from CSC during the same period that defendants were obligated to pay rent, 50 East did so for CSC Acquisition and Dr. Lau's benefit. Supreme Court was correct in crediting the payments CSC made from October 1st until January 6, 2016 to defendants' account. The damages award, however, needs to be recalculated for rents, interest and late fees due less offsets for rent received, all limited to the period ending January 6, 2016. To the extent the trial court made a calculation of damages under the lease and guaranty for any period after January 6, 2016, it was error. We therefore remand this matter to the trial court for a recalculation of damages for breach of the lease and guaranty consistent with this decision.
Turning to the ASA, Dr. Lau argues that he did not make any guarantees that CSC would not suffer any losses, or that the ASC would turn a profit and, therefore, the judgment against him was in error. Supreme Court did not, however, award CSC lost profits. Rather it awarded CSC operating expenses that were the natural and probable consequence of the breach (Bi-Economy Mkt., Inc. v Harleysville Ins. Co. of N.Y., 10 NY3d 187, 192 [2008]). The ASA obligated Dr. Lau to administer CSC's operations until closing. He was also obligated to make up any shortfall in CSC's receivables by providing monetary advances to keep the business afloat. CSC was having some financial difficulties and these unsecured, working capital loans, [*5]would allow CSC to continue operating the ASC by paying its bills and other obligations, including meeting its payroll.
Although these monetary advances were loans that would have to be repaid by CSC at closing, most significantly, they did not have to be repaid if, as was the case here, the APA failed to
close. Had the monetary advances been made by Dr. Lau, CSC could have kept whatever monies Dr. Lau loaned CSC to meet its operating expenses. Because Dr. Lau never made any monetary advances to CSC that he was obligated to make, CSC was forced to meet its own expenses. This left CSC in a worse condition than it would have been in had Dr. Lau provided the monetary advances he was required to. CSC was deprived of the benefit of its bargain, which would have allowed it to keep Dr. Lau's monetary advances. We, therefore, find that Supreme Court properly awarded plaintiff damages in the amount of $613,053.90 against Dr. Lau. This amount reflects net operating losses under the ASA through its date of termination, which under the circumstances would have been loans forgiven for CSC's benefit. Additionally, we find that CSC put forth evidence of its earnings and operating expenses at trial, and that defendants failed to prove CSC's calculations were inaccurate.
In accordance herewith, the judgment of Supreme Court, New York County (Andrew Borrok, J.), entered July 30, 2019, awarding plaintiff Center for Specialty Care, Inc. (CSC) the principal amounts of $6,500,000 for breach of the asset purchase agreement (APA), and $613,053.90 for breach of the administrative services agreement (ASA), and awarding plaintiff, 50 East 69th Street Corporation (50 East), $5,885,119.32 for breach of the lease and guaranty agreements, should be modified, on the law, to the extent that the damages award for breach of the lease and guaranty agreements should be vacated, and the matter remanded for recalculation of damages in accordance herewith, and the judgment otherwise affirmed, without costs.
All concur.
Judgment, Supreme Court, New York County (Andrew Borrok, J.), entered July 30, 2019, modified, on the law, to the extent that the damages award for breach of the lease and guaranty agreements should be vacated, and the matter remanded for recalculation of damages in accordance herewith, and the judgment otherwise affirmed, without costs.
Opinion by Gische, J. All concur.
Friedman, J.P., Renwick, Gische, Mazzarelli, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: AUGUST 13, 2020
CLERK