# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 146

### OCTOBER TERM, A.D. 2020

December 4, 2020

DENBURY ONSHORE, LLC and
DENBURY RESOURCES INC. n/k/a
DENBURY INC.

Appellants
(Defendants),

v.                                                    S-19-0172

APMTG HELIUM LLC,

Appellee
(Plaintiff).

*Appeal from the District Court of Sublette County*
The Honorable Marvin L. Tyler, Judge

*Representing Appellant:*
> Darin B. Scheer, James R. Belcher, and Casey R. Terrell of Crowley Fleck PLLP, Casper, Wyoming.  Argument by Mr. Scheer.

*Representing Appellee:*
> Scott P. Klosterman and Amy M. Iberlin of Williams, Porter, Day, and Neville, P.C., Casper, Wyoming; Jason A. Neville of the Spence Law Firm, LLC, Casper, Wyoming.  Argument by Mr. Neville.

*Before DAVIS, C.J., and FOX, KAUTZ, GRAY, JJ, and FENN, DJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]     Denbury Onshore, LLC (Denbury), a subsidiary of Denbury Resources Inc., agreed to deliver certain amounts of helium to APMTG Helium LLC (APMTG) each year. Denbury failed to deliver the agreed-upon amounts but claimed its nonperformance was excused by two force majeure events—the failure of its contractor to complete its natural gas processing plant and the ongoing failure of its supply wells due to sulfur deposition plugging the wellbores. After a bench trial, the district court found Denbury had failed to show its non-performance was excused by a force majeure event except for a period of 36 days. It awarded APMTG over $35 million in damages and interest. Denbury appealed. We affirm.

## ISSUES

[¶2]     We restate and reorder Denbury's issues as follows:

1.  Did the district court err by denying Denbury's request to terminate the parties' agreement under the doctrines of frustration of purpose and/or impossibility of performance?

2.  Did the district court err in deciding Denbury had failed to prove its non-performance between April 23, 2013, and December 30, 2013, was excused by a force majeure event (Contractor Failure FM)?

3.  Did the district court err in deciding Denbury had failed to prove its non-performance after mid-August of 2014 was excused by a force majeure event (Well Failure FM)?

## FACTS

*Original Helium Feedgas Agreement (HFA I)*

[¶3]     On January 30, 2009, APMTG, a joint venture between Air Products and Chemicals, Inc. (Air Products) and Matheson Tri-Gas, Inc. (Matheson), entered into a Helium Feedgas Agreement (HFA I) with Cimarex Energy Co. (Cimarex) and Riley Ridge, LLC (Riley Ridge). Under the agreement, Cimarex and Riley Ridge agreed to design, construct, and operate a natural gas processing plant (the Riley Ridge Plant or Plant) and to annually deliver specified quantities of helium to APMTG.[1] APMTG, in turn, agreed to design, construct and operate its own gas processing plant and to purchase the specified quantities of helium from Cimarex and Riley Ridge. The HFA I required Cimarex and Riley Ridge

---

[1] The parties' agreements refer to "helium feedgas" and "contained helium." We will simply refer to helium.

1

to deliver 200 million standard cubic feet (MMscf) of helium to APMTG the first and second years of the contract and 400 MMscf per year thereafter. Cimarex and Riley Ridge agreed to expand the Riley Ridge Plant on or before the start of the third year in order to meet their increased obligations. If they failed to deliver the required quantities in any given year, they were to pay APMTG liquidated damages pursuant to a designated formula. The liquidated damages were capped at $8 million per year, and total liquidated damages for the life of the contract could not exceed APMTG's final investment to construct its plant, which APMTG predicted would be $38.6-$42.9 million.

[¶4] The HFA I "estimated" that Cimarex and Riley Ridge would begin delivering helium to APMTG on December 1, 2010, but required delivery to begin no later than December 1, 2011, absent "delays caused by any Force Majeure" or unless the parties otherwise agreed in writing. The life of the agreement was 20 years.

[¶5] Section 17 of the HFA I excused a party's failure to perform its obligations under the agreement "to the extent that such failure is caused by Force Majeure." "Force Majeure" was defined in § 17.1 as

> any event outside the reasonable control of a Party that could not have been avoided or overcome by that Party's exercise of reasonable care and due diligence and shall include without limitation the following: strike, lockout, concerted act of workers or other industrial disturbance; fire, explosion, flood, blizzard, extreme weather conditions or other natural catastrophe; epidemic or pandemic; civil disturbance, riot or armed conflict (whether declared or undeclared); acts of terrorism; curtailment, shortage, rationing or allocation of normal sources of supply of labor, materials, transportation, energy or utilities; accident; act of God; *delay(s) or failure of performance of contractor(s) (of any tier) or vendor(s)*; sufferance of or voluntary compliance with act of government and government regulations and/or orders (whether or not valid); cancellation by the U.S. Bureau of Land Management, Department of the Interior, of the "Contract for Extraction and Sale of Federal Helium"; embargo; *natural or mechanical supply well failure (in whole or in part) and machinery or equipment breakdown*. Notwithstanding anything herein to the contrary, the following events shall not be considered Force Majeure events: the concentration of helium contained in the Helium Feedgas below that defined in Clause 9.1; and loss of markets for natural gas or Helium.

(Emphasis added). Section 17.3 of the HFA I required the party "whose performance under this Agreement is affected by Force Majeure [to] promptly Notify the other Party of the occurrence, and the effect and likely duration of the Force Majeure event, and . . . keep the other Party informed of any changes to those circumstances." Section 17.4 required the party claiming force majeure to "as soon as practicable after the commencement of the Force Majeure, proceed with diligence and do all things reasonably practicable at its own cost to overcome and/or remedy the situation, and to recommence performance of its obligations, provided that . . . neither Party shall be required to incur any extraordinary costs or make more than commercially reasonable investments."

### *Failure of Contractor Force Majeure*

[¶6]    Cimarex was the majority owner and operator of the Riley Ridge Plant project; Riley Ridge owned only a minority interest in the project. As operator, Cimarex made the day-to-day decisions about how to run the project. It hired BCCK Engineering Incorporated (BCCK) pursuant to a turn-key contract to engineer, design and construct the Riley Ridge Plant in Big Piney, Wyoming, and bring it to "mechanical completion," which was expected to occur by December 2011.

[¶7]    In July 2010, Denbury purchased Riley Ridge's interests in the Riley Ridge Plant and assumed all of its rights and obligations under the HFA I. About a year later, in June 2011, Denbury acquired Cimarex's interests in the Plant and the HFA I, as well as Cimarex's rights and obligations under the construction contract with BCCK. Two months later, on August 1, 2011, Denbury officially took over as operator of the Riley Ridge Plant project from Cimarex, which meant it began making the day-to-day decisions about how to run the Plant and Cimarex's employees became Denbury's employees. At that time, BCCK had completed the engineering design of the Riley Ridge Plant and was in the process of constructing the Plant.

[¶8]    The next month, Denbury notified APMTG it was "experiencing delays in the construction and commissioning of [the Riley Ridge Plant]" and estimated it would begin delivering helium on November 15, 2011. However, that did not occur. In January 2012, after discovering BCCK had not performed in accordance with industry standards, Denbury removed BCCK from the Riley Ridge Plant project and began using its own personnel and contractors to correct BCCK's deficiencies and complete the Plant.

[¶9]    On November 12, 2012, Denbury sent a letter to APMTG declaring force majeure under Article 17 of the HFA I due to "delay(s) or failure of performance of contractor(s) (of any tier) or vendor(s)" (hereinafter referred to as Contractor Failure FM). Denbury explained:

> Denbury has discovered through plant inspections by third party consultants who were hired to prepare for start-up and

3

commissioning . . . that there remained major uncompleted work at the plant. Whether caused by the contractor's construction mismanagement, or the failure to design equipment and controls properly, the deeper that Denbury investigated the circumstances, it became apparent to both Denbury and its third party consultants that the plant was not even close to being in a condition for operations that would satisfy not only operational safety considerations, but also the required regulatory compliance. As you are also very aware, this plant will be handling a production stream that contains corrosive and toxic, hazardous constituents that require not only high-grade equipment, but also particular alarm and emergency shut-down systems. Much of this work had not even been addressed by the previous contractor. As a result, and even before Denbury officially terminated the construction contract, third party experts undertook the work of redesigning, refurbishing and revising equipment, controls and systems to get the process up to . . . standards for a safe processing operation in accordance with OSHA rules and regulations.

The work is continuing and, based upon the latest information we have with our fast-track work schedule, the plant construction should be complete and ready for start-up by July 1, 2013.

APMTG disagreed with Denbury's declaration of force majeure and sent Denbury an invoice for $8 million based on Denbury's failure to deliver the agreed-upon amounts of helium the first year of the HFA I.

### *MOU and the Amended and Restated Helium Feedgas Agreement (HFA II)*

[¶10] After a series of negotiations, APMTG and Denbury entered into a "Memorandum of Understanding" (MOU) on April 25, 2013. Under the terms of the MOU, the parties agreed to execute an amended helium feedgas agreement, and Denbury agreed to pay APMTG an $8 million lump sum payment and $1.1 million for APMTG's expenses in operating its gas processing plant between December 1, 2012, and August 1, 2013.

[¶11] A month later, on May 23, 2013, the parties executed an "Amended and Restated Helium Feedgas Agreement" (HFA II). The HFA II required Denbury to begin delivering helium to APMTG no later than August 1, 2013, "except for delays caused by any Force Majeure" or if the parties agreed to a different date in writing. The HFA II, like the HFA I, was to terminate after 20 years. Denbury agreed to deliver 200 MMscf of helium per year the first three years and 400 MMscf per year thereafter. To meet the increased

4

quantities, Denbury was to start an expansion of the Riley Ridge Plant on or before January 1, 2017. The HFA II provided the same liquidated damages provision as the HFA I, including the $8 million annual cap. It capped liquidated damages for the life of the contract at $46 million, which represented APMTG's actual investment to construct its plant. The HFA II's force majeure provisions mirrored those of the HFA I. The parties agreed the HFA II would be "construed in accordance with the laws of the State of New York."

### Well Failure Force Majeure

[¶12] The Riley Ridge Plant was designed around five gas wells, identified by numbers based on their location on the property. Wells known as 10-14, 17-34, and 20-14 were drilled to the Madison Formation and 16-24 and 16-31 went to the Big Horn Formation, which is below the Madison Formation. Both formations contain helium. The 10-14 and 17-34 are older wells, having been drilled in approximately 1981. The remaining wells are newer; Cimarex drilled the 20-14 in 2008-2009 and Denbury drilled the 16-24 and 16-31 in 2013-2014.

[¶13] Prior to starting-up the Riley Ridge Plant, Cimarex and Denbury knew there was a risk of sulfur deposition due to the presence of hydrogen sulfide in Madison gas and the fact Exxon experiences sulfur deposition at its nearby Shute Creek Plant, which processes the same gas. They purposefully equipped the wells with larger and more expensive tubing in order to move any sulfur deposition to the surface, where it is easier to remediate. If sulfur deposition occurred downhole, they anticipated it could be treated with chemical solvents and a coil tubing (CT) operation.

[¶14] On December 30, 2013, Denbury started-up the Riley Ridge Plant using the 10-14 and 17-34 as supply wells. Less than four months later, on April 18, 2014, the 10-14 stopped producing due to sulfur deposition plugging the wellbore. Denbury hired a third-party contractor to perform a CT operation to remediate the sulfur deposition. The operation was successful and the 10-14 began producing again on May 3, 2014. The success was short-lived. On June 15, 2014, the 10-14 again stopped producing due to sulfur deposition.

[¶15] On April 23, 2014, the 17-34 was also shut-in due to sulfur deposition. A third-party contractor performed a chemical solvent treatment on the 17-34. The treatment did not restore the well to full production, so Denbury performed a CT operation on the 17-34 on April 29. The CT operation successfully cleaned out the sulfur deposition, but during the operation the controller lost control of the CT string and it remained suspended in the well for 5-6 days. Before Denbury could pull the string out, it broke apart due to the harsh downhole environment and a portion of it fell to the bottom of the hole.

5

[¶16]  On July 11, 2014, Denbury provided APMTG written notice of a new force majeure. In that notice, Denbury declared a force majeure "starting on June 15[, 2014,] continuing until about mid-August, at which time the [Riley Ridge Plant] is expected to be back on but at a potentially reduced rate" (hereinafter referred to as Well Failure FM).  Denbury explained the 10-14 had been shut-in due to sulfur deposition since June 15, 2014, and it had ordered a CT unit to clean it.  It stated the CT operation should begin on July 15 and take two days to complete, absent any delays.  It also noted the 17-34 had been shut-in since April due to sulfur deposition and explained its attempts to remedy it with a chemical solvent treatment and a CT operation, the latter of which resulted in equipment being lost in the hole.  It stated it had placed a snubbing unit in the 17-34 on June 2, 2014, to "remove all the remaining down-hole junk" and believed it was working.  It estimated the well had a "good chance" of being back on production in August.  Denbury promised to provide prompt notice when it could restart the Plant.

[¶17]  APTMG objected to Denbury's declaration of force majeure, claiming the well conditions described by Denbury did not constitute force majeure under the HFA II because they "are within [Denbury's] reasonable control and could have been avoided or overcome by the exercise of reasonable care and due diligence" under § 17.1.  It also objected because Denbury's July 11, 2014, letter did not constitute prompt notice of a force majeure under § 17.3.

[¶18]  On August 9, 2014, Denbury performed the second CT operation on the 10-14.  The operation "got through the sulfur deposition zone" but the string broke and Denbury's subsequent attempt to retrieve the string from the hole with a snubbing unit was only partially successful.  Similarly, the snubbing unit in the 17-34 was not able to retrieve all of the lost string.  CT string remains in both the 10-14 and 17-34.  Dr. Bruce Craig, a metallurgist and Denbury consultant, strongly recommended against performing any further CT operations due to the harsh downhole conditions.

[¶19]  Denbury delivered only 4.3 MMscf of helium to APMTG between December 30, 2013, and June 2014; Denbury has not delivered any other helium to APMTG.  It also did not expand the Riley Ridge Plant by January 1, 2017, as it promised to do in the HFA II.

### District Court Proceedings

[¶20]  APMTG filed a complaint against Denbury alleging breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.  Denbury agreed it had failed to provide the agreed-upon quantities of helium and to expand the Riley Ridge Plant but claimed its nonperformance was excused by the Contractor Failure FM and Well Failure FM.

[¶21]  The case ultimately proceeded to a seven-day bench trial.  Denbury bore the burden of proving its failure to provide the agreed-upon quantities of helium was excused by a

6

valid force majeure event. *See Beardslee v. Inflection Energy, LLC*, 904 F. Supp. 2d 213, 220 (N.D.N.Y. 2012), *aff'd*, 798 F.3d 90 (2d Cir. 2015) (the party invoking a force majeure provision bears the burden of establishing it has been met) (citing *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985)). The district court decided Denbury had failed to meet its burden except for a period of approximately 36 days (from July 11, 2014, to mid-August 2014). As a result, it found in favor of APMTG on its breach of contract claim and awarded it over $35 million in liquidated damages and interest. The court concluded APMTG's unjust enrichment claim was barred under New York law because the parties' disputes were controlled by a contract and APMTG had failed to prove Denbury's breach of the implied covenant of good faith and fair dealing was "not duplicative of its breach of contract claims."

[¶22] Denbury appealed. While this appeal was pending, Denbury Resources Inc. filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. Upon stipulation of the parties, the bankruptcy court granted relief from the automatic stay provisions for purposes of this appeal. Denbury Resources Inc. emerged from the bankruptcy case on September 18, 2020, and is now known as Denbury Inc.

[¶23] Additional facts will be set out, as necessary, in the discussion of the issues.

## APPLICABLE LAW

[¶24] The district court concluded the governing agreement was the HFA II and it was a valid and enforceable contract. Neither party challenges these conclusions on appeal. The HFA II states: "The provisions of this Agreement shall be construed in accordance with the laws of the State of New York." We will enforce a contract's choice-of-law provision and "apply foreign law when doing so is not 'contrary to the law, public policy, or the general interests of Wyoming's citizens.'" *Finley Res., Inc. v. EP Energy E&P Co., L.P.*, 2019 WY 65, ¶ 9, 443 P.3d 838, 842 (Wyo. 2019) (quoting *Res. Tech. Corp. v. Fisher Sci. Co.*, 924 P.2d 972, 975 (Wyo. 1996)). *See also, Bradley v. Bradley*, 2007 WY 117, ¶ 21, 164 P.3d 537, 543 (Wyo. 2007). We will apply New York law when interpreting the HFA II; however, Wyoming law controls any procedural matters, including the applicable standard of review. *See Smithco Eng'g, Inc. v. Int'l Fabricators, Inc.*, 775 P.2d 1011, 1018 (Wyo. 1989) ("Clearly, the law of the forum controls procedural matters.") (citations omitted).

## STANDARD OF REVIEW

[¶25] Our standard of review on appeal following a bench trial in the district court is well-established:

7

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail weighing disputed evidence. Findings of fact will not be set aside unless the findings are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. We review a district court's conclusions of law de novo on appeal.

*Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 31, 460 P.3d 230, 240 (Wyo. 2020) (quoting *Ekberg v. Sharp*, 2003 WY 123, ¶ 10, 76 P.3d 1250, 1253 (Wyo. 2003)) (other citations omitted). The district court's interpretation of the HFA II is a conclusion of law reviewed de novo. *See Larson v. Burton Constr., Inc.*, 2018 WY 74, ¶ 16, 421 P.3d 538, 544 (Wyo. 2018) ("Contract interpretation presents questions of law which we review de novo.").[2]

## DISCUSSION

### 1.     *Frustration of Purpose and/or Impossibility of Performance*

[¶26]  Denbury requested termination of the HFA II under the doctrines of frustration of purpose and impossibility of performance due to its chronic force majeure status.[3]  The district court denied its request because § 2.5 of the HFA II provided the exclusive remedy for termination of the agreement and nothing in the plain language of that provision allowed a party to terminate the HFA II based on those doctrines.  Denbury argues the

---

[2] Denbury suggests the district court's findings pursuant to Wyoming Rule of Civil Procedure 52(a) are not sufficient to indicate the factual basis for its decision on the contested matters.  Because neither party requested findings under Rule 52(a)(1)(A), the district court was required only to find generally for APMTG.  *See* Rule 52(a)(1).  *See also, Kimzey v. Kimzey*, 2020 WY 52, ¶ 38, 461 P.3d 1229, 1241 (Wyo. 2020).  Moreover, while the district court admittedly did not "include all findings and/or conclusions supported by the testimony and evidence adduced at trial," it did "include[] those findings and/or conclusions necessary to explain the Court's determinations of the issues to the parties."  The court's findings more than adequately explained the factual basis for its decision.

[3] Denbury also refers to impracticability of performance, but it appears that doctrine is synonymous to the impossibility of performance doctrine.  *See Matter of Liquidation of New York Agency & Other Assets of Bank of Credit & Commerce Int'l, S.A.*, 90 N.Y.2d 410, 424 (N.Y. 1997) (referring to "impossibility/impracticability of performance"); *Reed Found., Inc. v. Franklin D. Roosevelt Four Freedoms Park, LLC*, 964 N.Y.S.2d 152, 156 (N.Y. App. Div. 2013) (referring to "[t]he defense of impossibility or impracticability of performance").  We will refer simply to impossibility of performance.

8

district court erred in concluding the parties waived these doctrines merely by including a standard 90-day termination provision for uncured default. We agree with the district court with additional reasons.

[¶27]  First, it is unclear whether the doctrines of frustration of purpose and impossibility of performance allow for termination of a contract under New York law. While older New York cases suggest they do, more recent cases indicate they merely excuse a party's non-performance. *Compare Reed Found., Inc. v. Franklin D. Roosevelt Four Freedoms Park, LLC*, 964 N.Y.S.2d 152, 156 (N.Y. App. Div. 2013) ("The defense of impossibility or impracticability of performance is 'applied narrowly' *such that performance is excused* 'only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible' and that 'the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract.'") (emphasis added) (quoting *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902 (N.Y. App. Div. 1987)), *and PPF Safeguard, LCC v. BCR Safeguard Holding, LCC*, 924 N.Y.S.2d 391, 394 (N.Y. App. Div. 2011) ("For a party to a contract to invoke frustration of purpose *as a defense for nonperformance*, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense.") (emphasis added) (quotations and citations omitted), *with 119 Fifth Ave., Inc., Taiyo Trading Co., Inc.*, 73 N.Y.S.2d 774, 776 (N.Y. Sup. Ct. 1947), *aff'd sub nom.* 87 N.Y.S.2d 430 (N.Y. App. Div. 1949) ("The general principle underlying [the frustration of purpose doctrine] is that, where the purpose of a contract is completely frustrated and rendered impossible of performance by a supervening event or circumstance which was not within the contemplation of the parties and which could not have been anticipated and guarded against, *the contract is discharged*.") (emphasis added), *and Robitzek Investing Co., Inc. v. Colonial Beacon Oil Co.*, 40 N.Y.S.2d 819, 822 (N.Y. App. Div. 1943) ("Where there is complete frustration of performance of a contract by act of the government, *cancellation is permissible*.") (emphasis added) (citation omitted).

[¶28]  Even if the doctrines allow for termination of a contract under New York law, they are not available where "the event which prevented performance was foreseeable and provision could have been made for the event's occurrence." *Rebell v. Trask*, 632 N.Y.S.2d 624, 627 (N.Y. App. Div. 1995) (frustration of purpose) (citations omitted); *Kel Kim Corp.*, 70 N.Y.2d at 902 (impossibility). As a corollary, if the parties' contract provides for the occurrence of the alleged frustration or impossibility, then the parties obviously foresaw the frustration or impossibility and the doctrines are not available.

[¶29]  In *Center for Specialty Care, Inc. v. CSC Acquisition I, LLC*, 127 N.Y.S.3d 6, 9 (N.Y. App. Div. 2020), the defendants agreed to purchase the plaintiff's surgical center and to lease the premises until closing. The defendants failed to pay the rent under the lease but argued they were excused from doing so because the purpose of the lease was frustrated as they could not occupy the surgical center without a Certificate of Need (CON)

from the Health Department, which could not be obtained by the effective date of the lease. *Id*. at 13-14. The court concluded the frustration of purpose doctrine was not available because the parties' agreements "acknowledged and planned for" the fact the defendants would not be able to occupy the surgical center on the lease date due to the need for them to obtain a CON. *Id*. at 14. Specifically, the parties' agreements allowed the defendants to start deriving benefits from the surgical center prior to their occupancy of the building. *Id*.

[¶30] Similarly, in *Warner v. Kaplan*, 892 N.Y.S.2d 311, 313 (N.Y. App. Div. 2009), the plaintiff agreed to purchase a cooperative apartment from the defendants. The sales contract required plaintiff to deposit $230,000 in escrow and the sale to be approved by the cooperative's Board of Directors. *Id*. The plaintiff made the requisite deposit and the Board approved the sale. *Id*. The plaintiff died prior to closing. *Id*. Her estate sought return of the deposit due to, among other things, frustration of purpose. *Id*. at 313-15. It claimed it was justified in not continuing with the purchase of the apartment because the plaintiff was purchasing the apartment solely for her own residence and she was no longer living. *Id.* at 314-15. The court concluded the frustration of purpose doctrine did not apply because the sales contract expressly stated it was binding on the parties' "heirs, personal and legal representatives and successors in interest." *Id.* at 313. It reasoned: "The inclusion of this provision indicates that the parties explicitly contemplated, and provided for, the possibility of either party's death before closing, by specifying that the death would not terminate the contract, but that the contract would survive, to be performed by the successors or heirs of the deceased party." *Id.* Because the contract made explicit provision for the event of either party's death, the frustration of purpose doctrine was not available. *Id.* at 315. *See also, Neumann v. Metro. Med. Grp., P.C.*, 557 N.Y.S.2d 663, 664 (N.Y. App. Div. 1990) (plaintiffs' proposed amendments to their complaint were properly denied as meritless because their "cause of action seeking a declaration that the contract was terminated by frustration of purpose was correctly rejected, as the record demonstrates that the alleged 'frustration', Falkirk Hospital's cessation of operations, was contemplated by the contract").

[¶31] In this case, the HFA II expressly states "failure of performance of contractor" and "natural or mechanical supply well failure" will excuse a party's performance and the payment of liquidated damages if they "are outside [the party's] reasonable control" and "could not have been avoided or overcome by [the] exercise of reasonable care and due diligence." Because the parties "explicitly contemplated, and provided for" the possibility that BCCK would fail to perform under the construction contract and the supply wells would naturally or mechanically fail, the frustration of purpose and impossibility doctrines are not available. *Warner*, 892 N.Y.S.2d at 313.

[¶32] Moreover, as the district court noted, the parties set forth the grounds for termination of the HFA II in § 2.5, which provides:

10

> A Party shall be entitled to terminate this Agreement if the other Party is in default of a material obligation hereunder and has not commenced and does not diligently pursue, a cure of such default within 90 days following a reasonable period of receipt of Notice from the non-defaulting Party. Notwithstanding the foregoing, the Parties shall endeavor in good faith to rectify any material default hereof as expeditiously as possible upon receipt of Notice from the non-defaulting Party.

[¶33]  "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent. . . .  The best evidence of what parties to a written agreement intend is what they say in their writing. . . .  Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569-70 (N.Y. 2002) (citations and quotations omitted).  "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."  *Id.* (citation and quotations omitted).  *See also, Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (N.Y. 2009)  ("Where the language chosen by the parties has a definite and precise meaning, there is no ambiguity.") (citation and quotations omitted).

[¶34]  Section 2.5 is clear and unambiguous.  Under its plain language, Denbury may terminate the HFA II only if APMTG is in material default and fails to timely cure the default.  APMTG is not in material default of the HFA II.  Moreover,  § 2.5 does not include "failure of performance of contractor" and "natural or mechanical supply well failure" as grounds for termination.  Had the parties wished to allow termination of the agreement due to these events, they could have included them in § 2.5.  They did not and we are not at liberty to re-write the HFA II to include them.  *See Beardslee v. Inflection Energy, LLC*, 25 N.Y.3d 150, 157 (N.Y. 2015) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (citations and quotations omitted); *Robitzek Investing Co., Inc.*, 40 N.Y.S.2d at 822 ("If it were the intention of the parties [that the lease be cancelled in the event of a regulation of defendant's business], they could readily have provided [so] by employing language to that effect.").

[¶35]  Denbury wants us to imply the doctrines of frustration of purpose and impossibility of performance into the HFA II because without them, it claims, "the HFA II contains no mechanism to address a situation where, as here, a party has done all things 'reasonably practicable' to overcome a valid force majeure event, but cannot do so because the only viable options require 'extraordinary costs' or 'more than commercially reasonable investments.'"  The cases it relies on for the proposition that we can imply terms into a

11

contract are inapposite. They involved implied <u>duties</u>, in particular, the implied covenant of good faith and fair dealing, not <u>implied defenses to the nonperformance of such duties</u>, such as the doctrines of frustration of purpose and impossibility of performance. *See, e.g.,* W*akefield v. N. Telecom, Inc.*, 769 F.2d 109, 112 (2d Cir. 1985) (implied covenant of good faith and fair dealing prevented employer from terminating plaintiff for the purpose of avoiding the payment of commissions which are otherwise owed the plaintiff); *Zilg v. Prentice-Hall, Inc.*, 717 F.2d 671, 679 (2d Cir. 1983) (holding the promise to publish the plaintiff's book implies a good faith effort by the publisher to promote the book); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1575-77 (2d Cir. 1994) (concluding district court did not err in finding defendant had breached the implied covenant of good faith and fair dealing due to its inadequate promotional efforts). Moreover, its argument is contrary to New York law, cited above, which refuses to apply these doctrines if the parties could have or, as here, did provide for the occurrence of the alleged frustration or impossibility in their contract.

[¶36]   The district court did not err in denying Denbury's request to terminate the HFA II under the doctrines of frustration of purpose and impossibility of performance.

## 2.  *Contractor Failure FM*

[¶37]   The district court found the unambiguous terms of the HFA II prevented Denbury from claiming its November 15, 2012 Contractor Failure FM was still viable and ongoing beyond May 23, 2013, the date the parties executed the HFA II. According to the court, "[t]he HFA II represents the parties['] negotiated and agreed resolution of their dispute over the existence, *vel non*, of a qualifying force majeure event excusing Denbury's non-performance and, among other things, it expressly provides for an agreed-upon new commencement date of no later than August 1, 2013, for Denbury to provide helium to APMTG." It also found Denbury had "failed to prove that any purported ongoing force majeure event on or after May 23, 2013 (*i.e.*, the effective date of the HFA II) excusing non-performance under the HFA II was 'outside the reasonable control of [Denbury] that could not have been avoided or overcome by [Denbury's] exercise of reasonable care and due diligence.'" The court explained:

> Denbury assumed control of completion of the Riley Ridge Plant on August 1, 2011, and Denbury became its own 'engineer, designer, and general contractor' assuming the task of bringing the Riley Ridge Plant to 'mechanical completion' when it removed BCCK in January 2012. Denbury was in control of scheduling, sub-contracting, engineering, designing, and performing the work necessary to perform on its agreement with APMTG to supply helium feed gas under the HFA II.

12

It further found Denbury had failed to provide any notice, as required by the HFA II, of any ongoing or new force majeure event from May 23, 2013, to July 11, 2014, when it provided notice of the Well Failure FM. It rejected Denbury's claim that a string of emails concerning the start-up of the Plant between its project manager, Clay Duellman, and an APMTG engineer, Michael Carberry, provided the requisite notice.

[¶38] Denbury argues the district court erred in rejecting its Contractor Failure FM based on its finding that Denbury became its own "engineer, designer, and general contractor" after it removed BCCK from the project and therefore Denbury was responsible for the continuing delays in starting-up the Riley Ridge Plant. It claims that finding ignores the unrebutted testimony that (1) Denbury only assumed the responsibility of bringing the Plant to mechanical completion because it had to fix the failures of contractor BCCK under the turn-key construction contract, and (2) Denbury would not have assumed that responsibility but for the failure of performance of contractor BCCK. It points to the testimony of Bill Jackson, its construction project management expert, who opined "[t]he root cause of Denbury's failure to timely start the Plant up . . . was a failure by BCCK to properly engineer the plant and execute the project." Denbury further claims that had it not fixed BCCK's failures, it would have violated its obligations under § 17.4 of the HFA II, which requires it "to proceed with diligence and do all things reasonably practicable . . . to overcome and/or remedy the [force majeure]." It also maintains the district court erred in deciding it had failed to provide proper notice of a force majeure event after the execution of the HFA II.

[¶39] At the outset, we note the limited scope of Denbury's arguments. It does not challenge the district court's conclusion that the HFA II resolved the parties' dispute as to whether or not Denbury's November 12, 2012 Contractor Failure FM constituted a valid force majeure event under the HFA I or the court's conclusion that Denbury's alleged November 12, 2012 Contractor Failure FM did not continue after May 23, 2013, the date the HFA II was executed. Moreover, the Riley Ridge Plant began producing on December 30, 2013. While Denbury alleged in the district court the Contractor Failure FM had continued into August of 2014,[4] Denbury makes no such claim on appeal. Therefore, the limited question before us is whether the district court erred in finding Denbury failed to prove a valid force majeure event between May 23, 2013, and December 30, 2013. We see no error.

[¶40] Section 17.1 of the HFA II defines "Force Majeure," in relevant part, as "any event outside the reasonable control of a Party that could not have been avoided or overcome by that Party's exercise of reasonable care and due diligence and shall include without

---

[4] Dan Cole, Denbury's Vice President of Commercial Development and Governmental Relations, testified the Contractor Failure FM continued after the MOU and HFA II. He also indicated in an August 14, 2014, letter to APMTG that the Contractor Failure FM "*has actually continued and continues to this time*." However, in Denbury's July 11, 2014 Well Failure FM notice, Mr. Cole expressly stated the Contractor Failure FM "continued until December 30, 2013, when the Plant commenced operations . . . ."

13

limitation the following . . . delay(s) or failure of performance of contractor(s) (of any tier) or vendor(s)." "Force majeure clauses are to be interpreted in accord with their purpose, which is to limit damages in a case where the reasonable expectation of the parties and the performance of the contract have been frustrated by circumstances beyond the control of the parties. . . . [W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Constellation Energy Servs. of New York, Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (N.Y. App. Div. 2017) (citations and quotations omitted).

[¶41] The phrase "failure of performance of contractor" contemplates the failure of performance of a third-party contractor, not one of the parties. It would make little sense for a party's failure of performance to be contained in a force majeure provision, which is intended to excuse a party's non-performance. Properly construed, the district court correctly found there was no "failure of performance of contractor" between May 23, 2013, and December 30, 2013, because there was no third-party contractor. Denbury had removed BCCK from the project approximately 18 months earlier. *See Kel Kim Corp.*, 524 N.Y.2d at 386 ("[C]ontractual force majeure clauses [are] clauses excusing nonperformance due to circumstances beyond the control of the parties . . . . Ordinarily, *only if the force majeure clause specifically includes the event that actually prevents a party's performance will that party be excused.*") (emphasis added).

[¶42] Moreover, § 17.1 requires any "failure of performance of contractor" to be (1) outside the party's reasonable control, and (2) incapable of being avoided or overcome by that party's exercise of reasonable care and due diligence. Any failure to complete the Riley Ridge Plant between May 23, 2013, and December 30, 2013, was not outside Denbury's "reasonable control," because at that time <u>Denbury</u>, not BCCK, was in charge of bringing the Plant to mechanical completion. The fact Denbury had to correct BCCK's failures in order to do so is immaterial. As of May 23, 2013, Denbury knew of BCCK's failures and was in the process of correcting them. Yet, it executed the HFA II, in which it expressly agreed to begin delivering helium to APMTG by August 1, 2013. Additionally, as the district court found, by executing the HFA II, Denbury terminated its ability to continue to rely on its November 12, 2012 Contractor Failure FM to excuse any delay in the start-up of the Plant. Again, Denbury has not appealed that finding. Executing the HFA II was completely within Denbury's "reasonable control."

[¶43] The district court also correctly found Denbury failed to provide notice of a new force majeure event between May 23, 2013, and December 30, 2013. Section 17.3 of the HFA II requires the party "whose performance under the Agreement is affected by Force Majeure [to] promptly notify the other Party of the occurrence, and the effect and likely duration of the Force Majeure event, and . . . keep the other Party informed of any changes to those circumstances." Section 19.1 allows notices to be transmitted by post, facsimile, email or personally, but § 19.3 requires them to be addressed to APMTG's General Manager in Allentown, Pennsylvania, with a copy provided to Matheson in New Jersey.

14

[¶44]   The email exchange between Mr. Duellman and Mr. Carberry does not satisfy either § 17.3 or § 19.3.  On May 28, 2013, Mr. Carberry emailed Mr. Duellman requesting a status update and stated:  "I'm hearing that you are now looking at something in early August.  Any confirmation o[r] further information will be appreciated."  The next day, a mere six days after Denbury had executed the HFA II and agreed to begin delivering helium to APMTG by August 1, Mr. Carberry responded,

> We experienced delays in material deliveries and we now have all materials.  Workforce was increased to recover schedule but we are now addressing productivity concerns with the mechanical contractor.  Startup will not occur in July and the outlook appears to be late August based on current productivity.   Safety revisions are approximately 50% complete.  Denbury has hired Carl Robertson (PM) and placed [him] at the plant site until startup.   I am focusing on operational readiness items.

This email exchange does not mention § 17, force majeure, a failure of performance of contractor, or otherwise indicate Denbury was declaring a force majeure.  It was not sent to APMTG's General Manager, nor was a copy sent to Matheson.  The failure of this email exchange to constitute proper notice is readily apparent when it is compared to Denbury's November 12, 2012 and July 11, 2014 written notices of the Contractor Failure FM and Well Failure FM.  Denbury knew how to provide proper notice of force majeure; it did not provide any such notice between May 23, 2013, and December 30, 2013.

[¶45]   Denbury argues that under New York law, a lack of notice does not prevent a party from invoking a force majeure clause unless the contract clearly indicates notice is a condition precedent to a party's reliance on the force majeure provision.  We agree with this statement of New York law. *See Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 636 N.Y.S.2d 734, 737 (N.Y. 1995) ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.") (quotations and citations omitted); *Kidder Peabody & Co., Inc. v. Unigestion Intern'l, Ltd.,* 903 F. Supp. 479, 501 (S.D.N.Y. 1995) ("[A] contractual duty is not to be construed as a condition precedent unless the language of the contract clearly imposes such a condition.").  Denbury then claims nothing in the HFA II indicates notice is a condition precedent to reliance on the force majeure provision.  We agree the HFA II does not expressly make notice a condition precedent to a party invoking the force majeure provision.  Rather, it simply requires the party claiming force majeure "[to] promptly Notify the other Party of the occurrence, and the effect and likely duration of the Force Majeure event, and . . . keep the other Party informed of any changes to those circumstances." *See Toyomenka Pac. Petroleum, Inc. v. Hess Oil Virgin Islands Corp.*, 771 F. Supp. 63, 67 (S.D.N.Y. 1991) ("Although Clause QQQ requires the party

15

claiming force majeure to give written notice within forty-eight hours, whether such notice is a condition precedent to invoking force majeure is determined by the intention of the parties as expressed in the contract . . . . Clause QQQ does not expressly make a force majeure defense conditional upon giving notice within forty-eight hours."). Nevertheless, as Denbury acknowledges, it still had a duty under the HFA II to provide notice of a force majeure. *See Kidder Peabody & Co.,* 903 F. Supp. at 501 (although notice was not a condition precedent, it remained a contractual duty); *Toyomenka Pac. Petroleum, Inc.*, 771 F. Supp. at 68 (although notice was not a condition precedent to a force majeure defense, it was still a duty to be performed under the contract). Denbury failed to provide any notice of a force majeure between May 23, 2013, and December 30, 2013.

[¶46] Denbury maintains it did not materially breach its duty to provide notice because APMTG did not suffer any prejudice due to the lack of notice. It claims APMTG "was well-aware of the underlying facts and ongoing problems that delayed start-up of the [Riley Ridge] Plant," and it did not identify any different actions it would have taken had it received notice. The cases Denbury relies upon for this proposition, however, are inapposite. They either did not apply New York law or involve untimely notice, not a failure to provide any notice. *See Toyomenka Pac. Petroleum, Inc.*, 771 F. Supp. at 68 (untimely notice); *Vinegar Hill Zinc Co. v. United States*, 149 Ct. Cl. 494, 499-500, 276 F.2d 13, 16 (Ct. Cl. 1960) (federal law). Moreover, the evidence Denbury relies on for the proposition that APMTG was "well aware" of the underlying problems delaying the start-up of the Plant primarily consists of correspondence between Denbury and APMTG outside the relevant time period, i.e., prior to the HFA II or after the wells failed in 2014. The only communication occurring between May 23, 2013 and December 30, 2013, was the email exchange noted above, which indicated the Plant would start-up in late August, and an email exchange between Denbury and one of APMTG's representatives between September 11, 2013, and October 3, 2013, in which Denbury informed APMTG it could not provide a tour of the Riley Ridge Plant due to a "flurry of activity as we make the big push to complete, test, and get [the Plant] online." Neither of these email exchanges, however, indicated Denbury was relying on a force majeure, in particular, a failure of performance of a contractor, to excuse its failure to start-up the Plant on August 1.

[¶47] Further, the record supports a conclusion that APMTG was prejudiced by Denbury's failure to provide notice. Robert Lein, APMTG's general manager, testified that while APMTG was aware Denbury was not delivering helium, it did not know the failure was due to a force majeure event. Without such notice, Air Products and Matheson could not inform their customers not to expect helium deliveries due to their helium supplier being in force majeure, which in turn affected their "credibility and interactions with their customers."[5]

---

[5] Although they formed APMTG in order to obtain helium from the Riley Ridge Plant, Air Products and Matheson remained competitors in the industrial gas market.

[¶48]   The district court correctly decided Denbury had failed to prove its nonperformance between May 23, 2013, and December 30, 2013, was excused by a force majeure event.

### 3.  Well Failure FM

[¶49]   The district court found Denbury had "proven that between July 11, 2014, [the date it provided notice of the Well Failure FM], and mid-August of 2014, Denbury's selected end-date of the force majeure event (i.e., approximately 36 days), its non-performance under the HFA II was excused by a qualifying force majeure event which was then 'outside the reasonable control [of Denbury] that could not have been avoided or overcome by [Denbury's] exercise of reasonable care and due diligence.'"  However, it found Denbury had failed to show the Well Failure FM "extended beyond mid-August of 2014."  The district court explained:

> Denbury failed . . . to prove that, "as soon as practicable after the commencement of the Force Majeure, [Denbury] proceed[ed] with due diligence and [did] all things reasonably practicable at its own cost to overcome and/or remedy the situation, and to recommence performance of its obligations" or that [to do so it would have been] "required to incur any extraordinary costs or make more than commercially reasonable investments." (HFA II, § 17.4).  Denbury failed to prove that any event(s) excusing non-performance under the HFA II after mid-August of 2014 were "outside the reasonable control of [Denbury] that could not have been avoided or overcome by [Denbury's] exercise of reasonable care and due diligence."  Examples, but not a complete itemization of decisions and/or actions that Denbury has failed to prove were "outside the reasonable control of Denbury" or that "could not have been . . . overcome by Denbury's exercise of reasonable care and due diligence" excusing its non-performance under the HFA II, were (and are): failure to use the 20-14 well as a supply well; failure to attempt to or to actually implement remedy/remedies for the sulfur deposition issues in the supply wells; failure to actually use the Big Horn formation as an alternative source of gas for the Riley Ridge Plant; and failure to use the 16-31 and 16-24 wells to supply gas to the Riley Ridge Plant from the Madison formation or from the Big Horn formation.

[¶50] Denbury argues the district court correctly found the Well Failure FM was a qualifying event of force majeure under § 17 of the HFA II.  It claims, however, the court erred in finding the Well Failure FM ended in mid-August of 2014.  Denbury claims mid-

17

August was "plainly nothing more than a good faith estimate, not a binding determination." It also claims the unrebutted evidence shows the Well Failure FM was far from over on August 15, 2014. Rather, Denbury had lost another CT string in the 10-14 and its expert had advised it not to attempt any further CT operations due to the harsh downhole environment. As a result, it could no longer rely on the primary method it had planned to use to address downhole sulfur deposition and had to begin the "long, costly, and difficult process of evaluating countless potential alternatives."

[¶51]  The evidence supports the district court's finding that Denbury chose mid-August as the end date of the Well Failure FM. Denbury's July 11, 2014 letter declaring the Well Failure FM was clear. It stated: "Denbury *is claiming a new Force Majeure starting on June 15 continuing until about mid-August*, at which time the Plant is expected to be back on but at a potentially reduced rate."[6]  (Emphasis added).  While the exact date in mid-August was an estimate, Denbury clearly informed APMTG it was declaring a force majeure only until mid-August. Denbury never informed APMTG the circumstances had changed or provided APMTG a new force majeure end date.

[¶52]  Denbury claims it extended the Well Failure FM in a letter dated August 14, 2014, in which it stated the Riley Ridge Plant "has never had more than thirty-five days of sustained helium production performance, and the [helium] at that time was limited to the volume produced from only one supply well . . . ."  It explained:  "Denbury has been diligent in its attempts to solve the downhole problems that have been encountered since start-up. Nevertheless, while efforts continue to be made to find a permanent solution for the downhole well problems, none has yet been found."  Read as a whole, however, the purpose of the August 14, 2014, letter was not to extend the Well Failure FM, but rather to invoke the HFA II's dispute resolution procedures to resolve the parties' disagreement over the validity of the Well Failure FM. Additionally, the letter speaks to Denbury's failure to find a permanent solution to the downhole problems, not Denbury's inability to implement shorter-term solutions to resolve the Well Failure FM.

[¶53]  In any event, the district court also found Denbury had "failed to prove that the qualifying force majeure event deemed to have commenced on July 11, 2014, extended beyond mid-August of 2014."  Specifically, it found Denbury had failed to prove any event after mid-August was "outside the reasonable control of [Denbury] that could not have been avoided or overcome by [Denbury's] exercise of reasonable care and due diligence" as required by § 17.1 of the HFA II. Denbury maintains the district court was precluded from making this finding. It argues by finding the Well Failure FM was a valid force majeure event between July 11, 2014, and mid-August of 2014, the district court necessarily found the sulfur deposition was "outside [Denbury's] reasonable control" and

---

[6] Although Denbury claimed in its July 11, 2014 notice that the Well Failure FM began on June 15, 2014, the district court decided Denbury's notice was not "prompt" under §§ 7.2 and 17.3 of the HFA II and, as a result, deemed the Well Failure FM to have commenced on July 11, 2014. Denbury does not dispute this decision on appeal.

18

"could not have been avoided or overcome by the exercise of reasonable care and due diligence." And, it claims we cannot review this finding because APMTG chose not to appeal it. Denbury argues once the district court made this finding under § 17.1, it was required to analyze under § 17.4 whether Denbury "proceeded with diligence and did all things reasonably practicable" to overcome the Well Failure FM, subject to the "extraordinary costs" and "more than commercially reasonable investments" limitations. Denbury is mistaken for two reasons.

[¶54] First, its argument assumes the district court found <u>sulfur deposition</u> to be the force majeure event occurring between July 11, 2014, and mid-August 2014. The district court, however, did not specifically identify the force majeure event. The evidence shows the force majeure event was not supply well failure due to sulfur deposition but rather "mechanical supply well failure." In its July 11, 2014 Well Failure FM notice, Denbury informed APMTG the 10-14 and 17-34 had stopped producing due to sulfur deposition. However, the events Denbury described were the need to perform a CT operation on the 10-14 and to retrieve equipment from the 17-34. It was these events which were expected to be completed by mid-August of 2014, the date Denbury stated the force majeure would end. Dan Cole, Denbury's Vice-President of Commercial Development and Governmental Relations and the author of the July 11, 2014 notice confirmed it was these events, not sulfur deposition, which formed the basis for Denbury's Well Failure FM. He testified Denbury sent the July 11, 2014 force majeure notice because "after the issues with the well flow started in April or May and we were working to try to get the gas flow back, *we had some issues with equipment lost in the hole . . . and the snubbing unit trying to recover the junk in the hole* that the decision was made that we probably should be sending those force majeure *due to mechanical well failure*." (Emphasis added).

[¶55] Second, even if the district court found sulfur deposition to be the force majeure event between July 11, 2014, and mid-August 2014, this finding means only that sulfur deposition <u>during that time period</u> was outside Denbury's reasonable control and incapable of being avoided or overcome by the exercise of reasonable care and due diligence. It did not preclude the district court from finding that after mid-August, sulfur deposition was not a valid force majeure event because it was within Denbury's reasonable control and could have been avoided or overcome by the exercise of reasonable care and due diligence.

[¶56] Under § 17.1 of the HFA II, "natural or mechanical supply well failure" constitutes force majeure only if it (1) is outside the reasonable control of the party, and (2) could not have been avoided or overcome by the exercise of reasonable care and due diligence.

> In evaluating whether the 'reasonable control' element of [a] force majeure clause[] has been met, courts consider two related notions:

19

"First, a party may not affirmatively cause the event that prevents his performance. The rationale behind this requirement is obvious. If a contractor were able to escape his responsibilities merely by causing an excusing event to occur, he would have no effective obligation to perform.

The second aspect of reasonable control is more subtle. *Some courts will not allow a party to rely on an excusing event if he could have taken reasonable steps to prevent it. The rationale behind this requirement is that the force majeure did not actually prevent performance if a party could reasonably have prevented the event from occurring.* The party has prevented performance and, again, breached his good faith obligation to perform by failing to exercise reasonable diligence."

*In re Old Carco LLC*, 452 B.R. 100, 120-21 (Bankr. S.D.N.Y. 2011) (emphasis added) (quoting *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1540 (5th Cir. 1984)).

[¶57] The district court's finding that sulfur deposition after mid-August of 2014 was within Denbury's reasonable control and could have been avoided or overcome by the exercise of reasonable care and due diligence is not clearly erroneous and is supported by the evidence. Prior to starting up the Riley Ridge Plant, Denbury knew sulfur deposition was likely because Madison gas contains hydrogen sulfide and Exxon experiences sulfur deposition at its nearby plant, which processes the same gas. Indeed, the Plant's wells were purposefully equipped with larger and more expensive tubing than normal in order to increase the flow rates and thereby move any sulfur deposition to the surface, where it is easier to remediate.

[¶58] Denbury also knew the wells had damage ("skin") prior to starting up the Plant. Christina Harvick, a Denbury engineer and a member of Denbury's "sulfur team," testified the 10-14 and 17-34 were perforated in 2011 but were not brought online until December 2013. She stated that allowing a well to sit between perforation and the flowing of gas can create skin, which in turn can decrease the pressure and temperature and cause sulfur deposition. Patrick Colin Smith, Denbury's expert in production chemistry and sampling analysis, and Scott Stinson, a petroleum engineer who worked for Cimarex and continued on with Denbury until August 2012, confirmed this phenomenon. Moreover, Denbury knew temperature played a key role in sulfur deposition and starting the Plant in warmer

20

weather would reduce the chances for sulfur deposition. Yet, Denbury chose to start the Plant on December 30, 2013.

[¶59] Denbury started up the Plant with only two supply wells, even though Mr. Stinson testified three to four supply wells were needed to allow for flexibility. If one well experienced plugging or skin, it could be taken offline for an acid wash or re-perforation (adding holes to the tubing to allow more gas to flow into the wellbore), while Denbury could continue to produce gas from the other two to three wells. Denbury also failed to use the 20-14 as an injection well. Mr. Stinson testified Cimarex obtained permission from the Wyoming Oil and Gas Conservation Commission to use the 20-14 as an injection well. According to Mr. Stinson, it was imperative to reinject the gas back into the Madison Formation in order to prevent drainage, as drainage lowers the pressure in the reservoir and thereby increases the chances of sulfur deposition occurring. Mr. Smith confirmed there is a greater chance of sulfur deposition with a depleted reservoir.

[¶60] Prior to starting up the wells, Denbury was also aware of industry operations which can minimize or mitigate the effects of any damage in the wells, including sulfur deposition. Those operations included acid washes and re-perforating the wells. Ms. Harvick testified an acid wash cleans out the perforations, allowing more gas to flow into the wellbore and increasing temperature and pressure, which in turn decreases the opportunity for sulfur to deposit in the wellbore. Ray Lewis, Denbury's senior production engineer and "well guy," testified Exxon uses acid washes at its nearby plant, and Mr. Stinson testified he had anticipated an acid wash would be performed on the supply wells prior to the Plant starting. Similarly, Ms. Harvick and Mr. Lewis stated, and Mr. Smith confirmed, re-perforating wells increases flow rates, temperatures and pressures, thereby decreasing the chance for sulfur deposition. Denbury did not perform either operation prior to starting up the Riley Ridge Plant.

[¶61] Once the Plant started-up, the supply wells were choked off by sulfur deposition in the wellbore. While Denbury believed any sulfur deposition in the wellbore could be treated with CT operations and chemical solvents, the chemical solvent failed to restore the 17-34 to full production and the CT operations resulted in equipment left in the wells. Nevertheless, David Hamilton, Denbury's well engineer, opined the 10-14 and 17-34 could still produce even with the equipment in their wellbores. Moreover, the very same operations Denbury could have performed to reduce the risk of sulfur deposition prior to starting up the Plant could have been performed in August 2014 to restore flow in the 10-14 and 17-34. Mr. Stinson testified acid washes are considered routine well maintenance, and he anticipated they would need to be routinely performed at Riley Ridge. In fact, Cimarex and Denbury had a permit to inject the used acid from an acid wash into the 20-14. Ms. Haverick testified Denbury had to flow the wells to determine the extent of damage before performing an acid wash. She stated the sulfur team had discussed performing an acid wash on the 10-14 and 17-34, but had not recommended it to Denbury's Board of Directors as a potential remedy. She also testified the sulfur team had considered re-

21

perforating the wells but had yet to recommend it because they "would start out with the acid [wash] first" because "that's a cheaper option." Denbury never performed an acid wash or re-perforated the 10-14 and 17-34.

[¶62] Denbury also could have begun using the 20-14, 16-24 and 16-31 as supply wells in mid-August. Henry (J.R.) Roman, Denbury's project manager and "plant guy," and David Hamilton, a Denbury engineer, testified the 20-14 was drilled to the Madison Formation but was never perforated or used as a supply well. Ms. Haverick testified the 20-14 was never brought online but Denbury plans to perforate it at Layer 25, clean it out, and begin producing it. While she testified Denbury is "prepared to move forward [with using the 20-14 as a supply well] when needed," Denbury has not done so. The 16-24 and 16-31 wells are drilled to the Big Horn Formation. However, Mr. Lewis testified they could be capped off above the Big Horn and perforated into the Madison Formation. Denbury chose not to use the 16-31 and 16-24 as supply wells.

[¶63] Denbury claims it proceeded with diligence and did all things reasonably practicable at its own cost to overcome and/or remedy the situation, and to recommence performance of its obligations under § 17.4. The problem for Denbury is that § 17.4 is triggered only if there is a valid force majeure event under § 17.1. *See* Vol. 15, Ex. 6, p. 19, § 17.4 ("*Any party whose performance under this Agreement is affected by Force Majeure shall, as soon as practicable after the commencement of the Force Majeure*, proceed with diligence and do all things reasonably practicable at its own cost to overcome and/or remedy the situation, and to recommence performance of its obligations, provided that . . . neither Party shall be required to incur any extraordinary costs or make more than commercially reasonable investments."). As we have already discussed, the district court found, and the evidence shows, sulfur deposition did not constitute a valid force majeure event after mid-August 2014. In any event, the district court also found Denbury had failed to prove that "as soon as practicable after the commencement of the Force Majeure, [Denbury] proceed[ed] with diligence and [did] all things reasonably practicable at its own cost to overcome and/or remedy the situation, and to recommence performance of its obligations" or that it must have been "required to incur any extraordinary costs or make more than commercially reasonable investments."

[¶64] Denbury claims this finding is clearly erroneous. Mr. Smith opined Denbury had "left no stone unturned" in attempting to remediate the downhole sulfur deposition. Denbury maintains APMTG did not present any expert testimony to rebut this opinion and it is supported by the evidence. The evidence shows Denbury (1) evaluated downhole electrical heat and heat by circulation; (2) investigated and studied physical solvent batch treatments; (3) researched a dozen different chemicals for treatment of sulfur deposition, including the chemical used by Exxon, and analyzed their effects on the Plant's equipment; (4) became a member of Alberta Sulfur Research, Ltd. (ASRL) and conducted tours in Canada and bi-weekly calls with ASRL experts for the purpose of evaluating remediation options; (5) engaged in a multi-year survey and analysis of all publicly available

22

information from Exxon for information as to how it remediates its sulfur deposition; and (6) investigated the possibility of using gas from the Big Horn Formation, which contains helium but has a lower sulfur content than gas from the Madison Formation. Based on these efforts, Denbury presented the chemical batch treatment and using the Big Horn Formation to its Board. The Board approved beginning front-end engineering design for both options at a total cost of $1.1 million. Denbury ultimately decided against both options because the total estimated cost for the chemical batch option was determined to be $60 million in up-front costs (including $31 million to retrofit the Plant in order to protect it against the chemicals that would be used), plus $8 million per year in costs for the chemicals, and the total estimated cost for the Big Horn option was $160 million. Both investments would have equated to a negative present value of $40-$100 million and constituted extraordinary costs and exceeded commercially reasonable investments. APMTG did not claim otherwise.

[¶65] We need not decide whether the chemical batch treatment and Big Horn options constitute extraordinary costs and would require Denbury to invest more than is commercially reasonable. Denbury had other low cost options to re-start the 10-14 and 17-34. Mr. Stinson testified an acid wash costs between $300,000 and $1 million and re-perforating costs a few hundred thousand dollars. Ms. Haverick and Mr. Lewis confirmed these options are inexpensive, and Denbury presented no evidence indicating the implementation of these options would require them to incur extraordinary costs and more than commercially reasonable investments. *See Beardslee*, 904 F. Supp. 2d at 220, *aff'd*, 798 F.3d 90 (2d Cir. 2015) (the party invoking a force majeure provision bears the burden of establishing it has been met) (citing *Phillips Puerto Rico Core, Inc.*, 782 F.2d at 319).

[¶66] Denbury also could have begun using the 20-14, 16-24 and 16-31 as supply wells. Although the 16-24 and 16-31 are drilled to the Big Horn Formation, Denbury presented no evidence that plugging them off above the Big Horn and perforating them into the Madison Formation would require it to incur extraordinary costs or to make more than commercially reasonable investments. Denbury alleges it considered using these other wells but decided against it because, without a viable option to address sulfur deposition, it would risk losing another $40 million well. Consequently, Mr. Lewis did not recommend trying to flow Madison gas through these other wells until Denbury identified a chemical that could remove sulfur deposition from the wellbores and studied how the Riley Ridge Plant would need to be modified in order to accept that chemical. It claims the evidence showed Denbury would have had to spend $60 million to implement this option, which would have resulted in a negative present value to Denbury of between $40-100 million.

[¶67] Denbury's claim it could lose these wells to sulfur deposition ignores the actions available prior to flowing them which would reduce the chances of sulfur deposition in the wellbores. Denbury could perform an acid wash to remove any damage to these wells. It could perforate them just prior to flowing them, rather than allowing them to sit for two

23

years and sustain damage.  It could start them up in the summer.  And it could use one of the wells as an injection well, thereby preventing depletion of the reservoir.

[¶68]  In sum, as the district court aptly stated, "other than to study/investigate options, Denbury has not attempted to, nor actually implemented any remedy/remedies for the sulfur deposition issues in the [10-14 and 17-34]," and Denbury has "chosen" not to use the 20-14, 16-24, and 16-31 as supply wells.  These failures and choices do not constitute force majeure under the HFA II.  The district court correctly decided Denbury had failed to prove its nonperformance after mid-August of 2014 was excused by a force majeure event.

## CONCLUSION

[¶69]  The district court did not err in finding Denbury had failed to prove its non-performance of the HFA II was excused by a valid force majeure event, other than for a period of 36 days.  It also did not err in denying Denbury's request to terminate the HFA II under the doctrines of frustration of purpose and impossibility of performance.  We affirm.